# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re

McINTYRE BUILDING COMPANY, INC.,                    Case No. 10-30558-WRS

        Debtor.

McINTYRE LAND COMPANY, INC., and
SERVISFIRST BANK,

        Plaintiffs,

        v.                                                  Adv. Pro. No. 10-3029

BRANCH BANKING AND TRUST COMPANY
and SUSAN S. DePAOLA, TRUSTEE,

        Defendants.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

These proposed Findings of Fact and Conclusions of Law are made by the undersigned

Bankruptcy Judge pursuant to 28 U.S.C. § 157(c)(1).  This Adversary Proceeding came before

the Bankruptcy Court for trial on January 26, 2012.  At the conclusion of the trial, the Court

requested briefs, which have been filed, (Docs. 142, 143, 145, 146, 147).  On April 23, 2012,

further proceedings were held and the Court offered the parties an opportunity to file additional

briefs.  (Doc. 149, 152, 153).  The issues here are framed in two pleadings: (1) the Amended

Complaint of McIntyre Land (Doc. 100); and (2) the Answer, Counterclaim, and Crossclaim of

BB&T (Doc. 34).  For the reasons set forth below, the undersigned recommends that the District

Court: (1) dismiss the claims of Plaintiff McIntyre Land, with prejudice; and (2) enter judgment

in favor of Defendant BB&T, declaring that it has a valid mortgage on the Prattville Square

Shopping Center pursuant to its mortgage dated February 27, 2006.

# I. FINDINGS OF FACT

Discussion of the facts is divided into four parts. Part A identifies the key players, the relevant parcels of real property, and their relationships to one another. Part B describes the loan agreement and mortgage made February 27, 2006, involving Colonial Bank, McIntyre Building, and McIntyre Land. Part C describes the events surrounding the purported "collateral swap." Part D considers McIntyre Land's claims of fraud, misrepresentation, and inequitable conduct.

## A. The Key Players and Properties

The central character in this cast of players is a man named Innes McIntyre, who is not a party to this Adversary Proceeding. For simplicity sake he will be referred to as Innes. He was in the home building business for many years and then advanced to real estate development. Innes was the sole owner of McIntyre Building Co., Inc. ("Building"). Innes is married to Mitzi McIntyre, who owns all of the stock in McIntyre Land Co., Inc. ("Land").[1] Thus, Innes owns 100% of Building and Mitzi owns 100% of Land.

Building filed a petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on March 6, 2010, initiating Case No. 10-30558. Two days later, on March 8, 2010, Innes filed a petition in bankruptcy of his own, also pursuant to Chapter 11, initiating Case No. 10-30570. On

---

[1] While this Adversary Proceeding was pending, Daniel G. Hamm, the Chapter 7 trustee in Innes's Chapter 7 bankruptcy case, brought suit contending that Land is not in fact owned by Mitzi, but rather is truly owned by Innes and for that reason is property of the estate in Innes's Chapter 7 bankruptcy case. See Hamm v. McIntyre, et. al., Adv. Pro. 11-3097. For purposes of this Adversary Proceeding, the Court will assume that Land is owned by Mitzi. This assumption will not prejudice any party here and avoid an unnecessary complication. That the Court is making this assumption is not intended to prejudice any party from taking any position he finds appropriate in Adversary Proceeding 11-3097.

2

September 20, 2010, both cases were voluntarily converted to cases under Chapter 7.[2] Shortly thereafter, Susan S. DePaola was appointed as Chapter 7 trustee in both cases; however, Daniel G. Hamm was later substituted as trustee in Innes's Chapter 7 case, leaving DePaola as trustee only in Building's case. To summarize, Innes and Building are in insolvent and in bankruptcy, while Land and Mitzi are solvent and are not in bankruptcy.

To further complicate matters, Innes and Building were not the only parties to go broke. Colonial Bank became insolvent in 2009 and was taken over by the Federal Deposit Insurance Corporation ("FDIC"), which acquired the loan owed by Building and then transferred it to Defendant Branch Banking and Trust Company ("BB&T"). (Pl. Ex. 26). Thus, BB&T is the successor in interest to Colonial Bank with respect to the loan to Building. ServisFirst Bank lent money to Land under a separate agreement, which was secured by a mortgage on the Prattville Square Shopping Center. (Case No. 10-3084, Docs. 3, 4).[3] ServisFirst and BB&T each contend that they have a first mortgage on the Prattville Square Shopping Center.[4]

---

[2] In a case under Chapter 11, the debtor, or its officers, usually maintains control over the affairs of the debtor, acting as a debtor in possession. In cases under Chapter 7, a trustee is appointed who takes control of the debtor's assets and assumes responsibility for any litigation involving the debtor. As this case was initially McIntyre Land v. McIntyre Building, which is essentially Mitzi versus Innes, the Court was concerned about a possible conflict of interest. The subsequent conversion of the Chapter 11 case of McIntyre Building to Chapter 7 allayed the Court's concerns as a neutral Chapter 7 trustee then took over this Adversary Proceeding.

[3] The Bankruptcy Court consolidated Adversary Proceedings 10-3029 and 10-3084 by its order of February 7, 2011. (Doc. 58).

[4] The mortgage of BB&T was executed on February 27, 2006 and recorded in the office of the Judge of Probate for Autauga County, Alabama on April 12, 2006, at Book 2006, Page 3318. (Pl. Ex. 3). The mortgage of ServisFirst Bank was executed on June 26, 2009 and recorded on July 7, 2009, at Book 2009, Page 5128. (ServisFirst Ex. 25). While the mortgage of BB&T is clearly first in time, it is the contention of ServisFirst that the mortgage of BB&T either was or should be released pursuant to Land's complaint.

3

In addition to the players, there are three separate parcels of real property involved in these proceedings. First, there is a 90 acre parcel in Fairhope, which was purchased by Building with the proceeds of the $3.1 million loan at issue and which was to be developed into residential housing. Second, there is the Prattville Square Shopping Center, that consists of an existing shopping center in Prattville, Alabama and is owned by Land. Third, there is a 165 acre parcel of unimproved land in Autauga County, Alabama, outside of Prattville previously owned by Building. In short, Building owned the 90 acres in Fairhope and 165 acres in Prattville and Land owns the Prattville Square Shopping Center.

### B. The February 27, 2006 Mortgage

In February 2006 Innes, acting through his corporation Building, purchased 90 acres of undeveloped land in Fairhope, Alabama. Innes' intended to build residences on the property. On February 27, 2006, a Construction Loan Agreement in the amount of $3,105,000 was entered into between Colonial Bank and Building. (Pl. Ex. 7). Also on February 27, 2006, a mortgage was executed in favor of Colonial Bank by both Building and Land to secure the Construction Loan. (Pl. Ex. 3). The mortgage encumbered two parcels of land. The first was the 90 acres in Fairhope owned by Building and the second parcel was the Prattville Square Shopping Center. A single mortgage was executed by Innes, acting as President for both Building and Land. (Pl. Ex. 3).

Bill Renfroe, the Colonial Loan Officer who had primary responsibility for the loan, and his supervisor, Robert Hertenstein, gave testimony explaining the various loans to Building. They explained that federal regulations require a specified loan to value ratio on loans such as

4

this.  For example, if the regulations permit a bank to lend 85% of the value of the project, the

borrower must either make a down payment of 15% of the loan or it must pledge additional

collateral to meet the ratio.  The value of the 90 acre parcel in Fairhope was not sufficient by

itself to satisfy the condition; so, Innes and Mitzi decided to secure the loan with a second

mortgage on the Prattville Square Shopping Center, which was owned by Land and not by

Building.  In other words, Building borrowed $3.1 million from Colonial, using both the 90 acres

in Fairhope as well as the Colonial Square Shopping Center in Prattville to secure the loan and

thereby satisfy the regulation.  Land did not benefit directly from the $3.1 million loan, rather the

mortgage was an accommodation made by Land for the benefit of Building.

### C.  The Collateral Swap

In the latter part of 2006 Innes contacted Renfroe and asked if the mortgage on Prattville

Square could be released and in its stead substitute a 165 acre parcel of unimproved land in

Autauga County, Alabama owned by Building.  The purpose of this collateral swap was to free

Prattville Square, owned by Land, from the mortgage securing the debt owed by Building.  In

response, Renfroe wrote Innes a letter dated December 22, 2006, as follows:

5

Dear Innes:

This is to advise that Colonial Bank (Colonial) has agreed to
release the Prattville Square Shopping Center as collateral on the
referenced loan and replace it with 140 acres of land in Prattville.
This is subject to a new appraisal being ordered to confirm that the
proper loan to value on the property will be maintained.  By
signing this letter you agree to pay for the appraisal on the 140
acres.

Sincerely,


/s/ Bill R. Renfroe
Vice President



BY:_____
   Innes McIntyre     Date

The full text of the December 22, 2006 letter is set out above and a copy was admitted

into evidence as Plaintiff's Exhibit 4.  While the letter refers to a 140 acre parcel in Prattville, it

was clear from the evidence that the letter meant the 165 acre parcel of unencumbered and

unimproved land in Autauga County, outside the Prattville city limits, that was owned by

Building.  Building did not own any other acreage in Autauga County.  The letter was signed by

Renfroe and was on Colonial Bank stationary.  There was a signature block for Innes McIntyre,

but the evidence offered at trial established that Innes did not sign the letter.

Renfroe testified that an appraisal was done and that he determined that the 165 acre

parcel was of sufficient value to maintain the necessary loan to value ratio.  (Pl. Ex. 29).

Renfroe, Hertenstein, and Innes all testified that they intended to proceed with the collateral swap

as outlined in Renfroe's December 22, 2006 letter to Innes.  The evidence was both clear and

6

undisputed that no mortgage was ever prepared, executed, or recorded on the 165 acre parcel; nor was a release of the mortgage on Prattville Square ever made.[5]

The Court heard several hours of testimony and a wealth of documents were offered concerning what happened subsequent to December 22, 2006. Land offered a "Colonial Bank Montgomery Region Loan Committee Memorandum" authored by Renfroe and dated February 5, 2007. (Pl. Ex. 5). The five-page memorandum details the status of the outstanding loans to Building. Land noted a passage in the memorandum concerning the collateral swap, which provides as follows: "The loan was previously secured by a 1st REM [real estate mortgage] on the Prattville Square Shopping Center, however that collateral has since been released with the 165 acres in Prattville taking its place and relieving the previous Regulation H violation." (Pl. Ex. 5). This passage indicates that Colonial was under the impression that the collateral swap proposed in Renfroe's December 22, 2006 letter had in fact been accomplished. This memorandum was prepared in connection with a 90-day extension of the $3.1 million loan agreement, which had come due.

Renfroe wrote Innes on May 24, 2007 in connection with the again expiring loan agreement. (Pl. Ex. 8). Land noted another passage in May 24 letter that again makes reference to the collateral swap. (Pl. Ex. 8, p. 2). On December 30, 2008, Innes and Colonial entered into a "Credit Agreement" consolidating several outstanding loans. (Pl. Ex. 18). Paragraph 1.14(7) provides property descriptions which again suggest that Colonial was under the impression that the collateral swap had been done. Both Renfroe and Hertenstein testified that they thought that

_____

[5] Land contends that the December 22 letter is a release in and of itself. The contention is considered and rejected in Part II(B)(2), <u>infra</u>.

7

the collateral swap had been done, and had it been brought to their attention that it had not, would have willingly gone forward with it. The evidence is also clear that Innes did not demand that the collateral swap be done until much later. Notwithstanding the hours of testimony and dozens of exhibits, no one was able to explain why the collateral swap did not get done. Innes and Building were becoming increasingly financially distressed and, for that matter, Colonial was also then teetering on the brink of insolvency. Perhaps in all this turbulence and amid the crush of other business, the collateral swap simply fell through the cracks. For all the misunderstandings, it is clear that a release of the mortgage on the Prattville Square Shopping Center was not accomplished and that a mortgage on the 165 acres in Autauga County was never prepared, executed, or recorded.

BB&T offered a copy of a Promissory Note dated December 30, 2008, in the amount of $3.1 million, which is a renewal of the original note. (Def. Ex. 1). Paragraph 3 of the Note states that "[p]ayment of this Note is secured by a Mortgage dated February 27, 2006 recorded in the . . . Autauga County Judge of Probate at Book 2006, Page 331." The December 30 Note is executed by Innes as President of Building. The December 30, 2008 Promissory Note clearly indicates the true state of affairs, reflecting the existence of the mortgage. Innes was unable to explain why he would have signed the Note with that provision if it was his contention that the mortgage either was or should have been released pursuant to Renfroe's December 22, 2006 letter.

More than one year later, on February 4, 2010, Innes wrote the lawyers for BB&T, insisting that the collateral swap be concluded. (Pl. Ex. 22). By this time, Colonial had failed and BB&T had acquired the $3.1 million loan. BB&T responded a week later and declined

8

Innes' demand. (Pl. Ex. 23). While the collateral swap may have made sense to Colonial in December of 2006, the subsequent failure of Building and Colonial, the collapse of the real estate market, and the fortuity involving the release of first mortgage on Prattville Square combined to make the collateral swap a bad deal for BB&T by 2010. In March of 2010, both Innes and Building filed petitions in bankruptcy.

This case provides a good illustration of the financial climate in Alabama in the early twenty-first century. The 165 acres in Autauga County was appraised for $1,653,000 on January 19, 2007. (Pl. Ex. 29). On February 7, 2011, Trustee DePaola moved to sell the property for $210,000. (Case No. 10-30558, Docs. 112, 115, 126). BB&T objected to the sale, contending that the sale price was too low. The Bankruptcy Court conducted an evidentiary hearing and determined that $210,000 was an appropriate price in the current market. While the collapse of real estate prices is not material to the legal issues here, it explains the motivations of the parties.

### D. Fraud, Misrepresentation, and Inequitable Conduct

Land has argued throughout this case that the conduct of Colonial and BB&T has been unfair, dishonest, and fraudulent. Having heard the testimony of the witnesses, I find that these claims are without merit. The evidence does not show even one intentionally false or misleading statement by either Renfroe or Hertenstein–the Colonial Bank officers involved with the loan and mortgage. To be sure, the evidence is replete with references to the effect that Renfroe, Hertenstein, and Colonial were under the impression that the collateral swap had been done. I find that all these statements, while incorrect factually, were not made with the intent to deceive.

9

Land's claim of fraud is defeated also by the December 30, 2008 renewal of the $3.1 million Note. (Def. Ex. 1). The Note was signed by Innes in his capacity as President of Building, but this knowledge is attributable to Land as well because Innes was also President of Land. (Pl. Ex. 3). By executing the December 30, 2008 Note, it is clear that Innes had actual knowledge of the continued existence of the BB&T mortgage on Prattville Square and the intention of Colonial to hold the mortgage.

Innes has been in the business of building houses and developing property most of his adult life. He knows what a mortgage is and he knows what a release is. He knew, or should have known, that neither had been done with respect to the 165 acres in Prattville or the Prattville Square Shopping Center. Any reliance on the part of Innes, Building, or Land on the misstatements of Renfroe or Colonial was not reasonable.

The culpability of Innes is at least equal to and probably greater than the culpability of either Renfroe or Hertenstein. The reason is that the February 27, 2006 deal had been done. It was Innes and not Colonial who wanted the collateral swap accomplished. Innes, as the proponent of the transaction, should have been following up, and he did not. The claims of Land, that it has been wronged, are without merit.

## II.  CONCLUSIONS OF LAW

These proposed conclusions of law are divided into two Parts. In Part A, I will consider three threshold issues: (1) subject matter jurisdiction, (2) whether this is a core proceeding, and (3) the effect of the bankruptcy filing of Building on the legal contentions of the parties. In part B, I will consider four substantive issues: (1) the D'Oench, Duhme doctrine, (2) whether

Renfroe's December 22, 2006 letter was a release in and of itself; (3) Land's claim of fraud; and

(4) the failure of consideration.

**A.  Subject Matter Jurisdiction, Core Proceedings, and The Bankruptcy Filing**

**1. Subject Matter Jurisdiction**.

The District Court's subject matter jurisdiction is governed by 28 U.S.C. §§ 1334(b) and

(e) which provide, in part, as follows:

> (b) . . . the district courts shall have original but not exclusive
> jurisdiction of all civil proceedings arising under title 11, or arising
> in or related to cases under title 11.
>
> * * *
>
> (e) The district court in which a case under title 11
> is commenced or is pending shall have exclusive
> jurisdiction–
>
>> (1) of all the property, wherever located, of
> the debtor as of the commencement of such case,
> and of property of the estate[.]

28 U.S.C. §§ 1334 (b), (e).

The question as to whether this Court has § 1334 jurisdiction here turns on whether the

dispute arising out of the collateral swap agreement "relates to" the bankruptcy case of Building.

The United States Court of Appeals for the Eleventh Circuit has explained what it means to

"relate to" a bankruptcy case in this context:

11

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. The proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.), 910 F.2d 784, 787 (11th Cir. 1990) (adopting the rule handed down by the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3rd Cir. 1984)); see also Cont'l Nat'l Bank of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1345 (11th Cir. 1999); Kindrick v. CMI Electrs., Inc., 2011 WL 3682777 (M.D. Ala. Aug. 23, 2011) (Watkins, CJ); Dillard v. HomEq Servicing, 2005 WL 1241120 (M.D. Ala. May 24, 2005) (Walker, MJ); Transouth Fin. Corp v. Murry, 311 B.R. 99, 105-06 (M.D. Ala. 2004) (Albritton, J.); In re Harris, 298 B.R. 897, 900 (Bankr. M.D. Ala. 2003) (Williams, BJ).

As the only arguable source of a duty on the part of BB&T to release the mortgage on Prattville Square arises from the swap agreement and regardless of how McIntyre phrases its claim against BB&T, the question of subject matter jurisdiction can only be considered against the backdrop of the collateral swap agreement. The February 27, 2006 mortgage and loan agreement are at the heart of that matter.

Consider the following points: First, the $3.1 million loan was made to Building and therefore is a claim against a bankruptcy estate. Second, that loan was originally collateralized by the 90 acres in Fairhope, which was property of Building–a debtor in bankruptcy–and Prattville Square, which is property of Land but not property of a bankruptcy estate. Third, the

purpose of the collateral swap was to encumber 165 acres owned by Building–and therefore property of the bankrupt estate–and free up Prattville Square. Every piece of this transaction affects property of the estate and a claim against the estate of Building. Encumbering the 165 acres in Autauga County would otherwise encumber unencumbered property of the estate with the BB&T mortgage, all to the detriment of unsecured creditors in the Building case. Moreover, by freeing up Prattville Square, the estate of Building is diminished because collateral otherwise available to satisfy the $3.1 million owed BB&T would no longer be available, thereby diluting the value of unsecured claims held by creditors of Building. Considering the Lemco Gypsum test in light of the facts here, it is not only conceivable that the outcome of this proceeding would have an effect upon the estate, it is certain that it will.

In Count One of its Amended Complaint, Land casts its claim in terms of an action to quiet title. (Doc. 100). In Count Two, it makes a claim in terms of misrepresentation. On the surface, one might argue that an action between Land and BB&T concerning Prattville Square does not relate to the Building bankruptcy. If that were so, then this Bankruptcy Court would lack § 1334 jurisdiction and it would have to dismiss this action for lack of subject matter jurisdiction. However, the so-called quiet title action does not exist in a vacuum. Rather, the right that Land seeks to vindicate arises out of the collateral swap, which necessarily involves property of the Building bankruptcy estate and debts which are claims in the Building bankruptcy case. Whether Land attempts to dress its claim up as one to quiet title or for fraud and misrepresentation, it necessarily relates to the Building bankruptcy because the collateral swap agreement is the linchpin upon which everything else hinges. For this reason, this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).

13

## 2.  This is a noncore proceeding.

Having concluded that the Bankruptcy Court has subject matter jurisdiction, I must next consider whether this is a core proceeding.  A bankruptcy court may enter a final order disposing of a core proceeding, subject to appeal to the District Court.  28 U.S.C. § 157(b).  On the other hand, if a matter is not core, then the Bankruptcy Judge must make proposed findings of fact and conclusions of law and forward them to the District Court which will make a final judgment after a de novo review.  Id. at § 157(c).  Core proceedings are defined at 28 U.S.C. § 157(b)(2).  The United States Court of Appeals for the Eleventh Circuit has stated as follows:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference.  If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.  If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

In re Toledo, 170 F.3d at 1348 (adopting the test handed down by the Fifth Circuit in Wood v. Wood (In re Wood), 825 F.2d 90 (5th Cir. 1987)) (emphasis in the original).

Applying Toledo here, I conclude that this proceeding is noncore.  This conflict arises under contracts, promissory notes, and mortgages.  The dispute could have arisen absent a bankruptcy filing.  On the other hand, a core proceeding can only arise in the context of a bankruptcy case.  To be sure, the bankruptcy filing made by Building complicated things for Land, but the underlying dispute here is one involving state law rights under contract and property.  For this reason, this is a noncore proceeding.

14

### 3. The Effect of Building's Bankruptcy Filing.

While the undersigned has concluded that this is a noncore proceeding, meaning that the dispute could have arisen absent a bankruptcy filing, it is nevertheless important to consider the impact of the bankruptcy filing made by Building. Building filed a petition in bankruptcy, pursuant to Chapter 11 of the Bankruptcy Code, on March 6, 2010. At that time, Building owed BB&T $3.1 million under the February 27, 2006 promissory note, as well as amounts under other loans. The $3.1 million was secured by the 90 acres[6] in Fairhope owned by Building and the Prattville Square Shopping Center, which was owned by Land. Because Land had pledged the Prattville Square Shopping Center to secure the $3.1 million loan, it had a contingent claim against Building. The 165 acre parcel in Autauga was owned by Building free and clear. Upon the filing of the bankruptcy petition by Building, its trustee in bankruptcy held the status of a hypothetical judgment lien creditor and of a bona fide purchaser. 11 U.S.C. § 544. Therefore, even it BB&T was willing to go forward with the proposed collateral swap (which it is not), it would be prevented from doing so by the strong arm powers of the trustee in bankruptcy pursuant to § 544. See also Abney v. Cox Enters. (In re Fulton Air Serv., Inc.), 777 F.2d 1521 (11th Cir. 1985); First S. Bank v. Shepard (In re Stanphill), 312 B.R. 691, 693-94 (Bankr. N.D. Ala. 2004) (The trustee has the rights of a hypothetical bona fide purchase as of the commencement of the case.).

---

[6] The Court further recognizes that while the original parcel was 90 acres, that it was sold in parcels. Building indicates in its Schedules that it owned 40 acres of land in Fairhope, suggesting that 50 acres had been sold by the time of the bankruptcy filing. While the size of the parcel is a moving target, for clarity sake, the undersigned will use the 90 acre figure consistently throughout. Moreover, the February 27, 2006 Promissory Note was renewed on December 30, 2008. (Def. Ex. 1).

15

The bankruptcy filing of Building raises other aspects which the undersigned finds troubling. Innes wrote BB&T on February 4, 2010, demanding that BB&T follow through with the collateral swap agreement. (Pl. Ex. 22). On March 1, 2010, the law firm of Fritz & Hughes wrote BB&T, on behalf of McIntyre Land, again demanding that the collateral swap be accomplished. (Def. Ex. 2). Within two weeks, Fritz & Hughes filed petitions in bankruptcy on behalf of both Innes and Building. Fritz & Hughes had a conflict of interest in that they were attempting to remove collateral which would have benefitted the creditors of Building. To further compound the error, the claim that Land held against Building was not disclosed in Building's bankruptcy filings.[7] (10-30570, Doc. 116) (10-30558, Doc. 25).

### B. Substantive Legal Issues: Contract; **D'Oench, Duhme**, and Fraud

#### 1. Enforcement of the Collateral Swap Agreement is Barred by the Provisions of 12 U.S.C. § 1823(e) and the D'Oench, Duhme Doctrine.

##### a. Introduction to the D'Oench, Duhme doctrine.

Defendant BB&T contends that the collateral swap agreement is not enforceable against it citing the provisions of 12 U.S.C. § 1823(e) and the case of D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp., 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942); see also Langley v. Fed. Deposit Ins. Corp., 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); Fed. Deposit Ins. Corp. v. McCullough, 911 F.2d 593 (11th Cir. 1990); Fed. Sav. and Loan Ins. Corp. v. Two

---

[7] The Court expressed its alarm that the claim of Land was not disclosed in Building's bankruptcy schedules. (Case No. 10-30570, Doc. 116). The failure to disclose Land's claim in Building's bankruptcy case undercuts Land's claim that it is an innocent party. Indeed, Innes's attempt to force the collateral swap agreement on the eve of his bankruptcy filing appears to have been an attempt by him to defraud the creditors of Building. Land's many protestations that it has been done wrong are hypocritical.

16

Rivers Assocs., Inc., 880 F.2d 1267 (11th Cir. 1989). In D'Oench, Duhme the Supreme Court announced a federal common law doctrine that when the FDIC takes the assets of a failed bank, it is not bound by agreements which are not in writing and which are not contained in the depository bank's records. Id.; accord First Union Nat'l Bank of Fla. v. Hall, 123 F.3d 1374, 1379 (11th Cir. 1997). This protection also extends to banks who acquire loans from the FDIC. Hall, 123 F.3d at 1379. The D'Oench, Duhme doctrine has been both expanded and codified.

Section 1823(e) provides as follows:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by a purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement–
>
>  (A) is in writing,
>
>  (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset of the depository institution,
>
>  (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
>  (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

Examination of this statute shows that the collateral swap agreement at issue here is not enforceable against BB&T because it was not executed by Land, the person who is claiming an adverse interest. 12 U.S.C. § 1823(e)(B). Before addressing the specifics of this issue, the undersigned will note that the D'Oench, Duhme doctrine has expanded considerably since 1942

17

when the Supreme Court handed down that decision.  See Baumann v. Savers Fed. Sav. & Loan Assoc., 934 F.2d 1506, 1515 (11th Cir. 1991) (noting that D'Oench, Duhme had expanded considerably and that doctrine applies even when customer is innocent).  In D'Oench, Duhme there was a secret agreement to the effect that the depository bank would not enforce a written promissory note.  The Supreme Court refused to enforce the secret agreement, finding that it would be a fraud.  D'oench, Duhme, 315 U.S. at 458-60, 62 S.Ct. at 679-81.  In the case at bar, Bill Renfroe's December 22, 2006 letter was signed by him and a copy maintained in the bank's records.  There was no secret here.  However, the plain language of 12 U.S.C. § 1823(e) and subsequent case law go considerably further in protecting the FDIC and banks, such as BB&T, who take by assignment from the FDIC.  This case turns on the plain language of the statute and not a narrow reading of D'Oench, Duhme.

### b.  Land's "no asset" exception argument lacks merit.

Land argues that D'Oench, Duhme does not apply because the mortgage on the Prattville Square Shopping Center was released as a result of Renfroe's December 22, 2006 letter.  (Doc. 125, pp. 7-10).  Land contends that because the mortgage was released on December 22, 2006, Prattville Square was not an asset of Colonial at the time it failed and was not acquired by the FDIC or transferred to BB&T in 2009.  Land relies on a Fifth Circuit case, Fed. Deposit Ins. Corp. v. McFarland in support of this proposition.  33 F.3d 532, 537 (5th Cir. 1994) (The "no asset" exception "is generally defined as precluding the application of 1823(e) where 'the parties contend that no asset exists or an asset is invalid and that such invalidity is caused by acts independent of any understanding or side agreement.'").

18

Land's argument fails because it misconstrues the nature of the December 22, 2006 letter. As will be set forth in more detail in Part II(B)(2) below, the December 22 letter was an offer to enter into an agreement that was not completed. It was not in and of itself a release of the mortgage. Land's "no asset" argument might be valid if the December 22 letter was a release, but it is not and it therefore follows that the mortgage was an asset of Colonial and was in fact acquired by BB&T.

### c. Section 1823(e) bars Land from enforcing the collateral swap agreement because it did not sign it.

Section 1823(e)(B) provides that contracts may not be enforced against the FDIC and assignees, such as BB&T, unless it meets several conditions, including:

> (B) was executed by the depository institution <u>and any person claiming an adverse interest thereunder</u>, including the obligor, contemporaneously with the acquisition of the asset of the depository institution

12 U.S.C. § 1823(e)(B) (emphasis added). As Land claims an interest adverse to BB&T, it cannot enforce the agreement because it did not execute the agreement. Indeed, no one other than Bill Renfroe of Colonial Bank executed the agreement. In a case squarely on point, the Eleventh Circuit stated the following:

> Where only a single party has signed a document, that document itself does not establish that the non-signatory is required to perform any obligations contained in the document. Instead, it would be necessary to resort to an assessment of the non-signatory's words or acts in order to determine whether that party is so bound. . . . While such an inquiry may be permissible in the context of normal contract construction, we do not believe that D'Oench and section 1823(e) permit this inquiry.

<u>Twin Constr., Inc. v. Boca Raton, Inc.</u>, 925 F.2d 378, 384 (11th Cir. 1991). Because Land did not execute the collateral swap agreement, it may not now enforce that agreement against BB&T

19

and we may not now try to asses the situation based on Innes's words or acts. See generally Hall, 123 F.3d at 1379-81 (The court barred enforcement of contract not signed by bank, citing D'Oench and § 1823(e)). Indeed, the facts show that Innes's words and actions do not even clearly point to him being bound to the agreement as he never followed up on the December 22, 2006 letter and he subsequently signed a promissory note renewing the February 27, 2006 mortgage.

It further should be noted that requiring that the party seeking to enforce an agreement to have signed it prevents the FDIC from being caught in a "heads I win, tails you lose," situation. Subsequent changes in the real estate market made the collateral swap a bad deal for BB&T. Had things turned out differently, with BB&T wanting to enforce the agreement and Land wanting to forget the whole thing, one can easily see Land refusing to go forward with a claim that it is not bound because it did not sign the agreement. Under those circumstances, such a claim could well have prevailed. It is situations such as this that D'Oench, Duhme and § 1823(e) seek to prevent. Transactions should be properly documented and promptly executed and completed. This one was not. Land did not sign the agreement and for that reason it cannot enforce it.

Land argues that the December 22, 2006 letter from Renfroe is part of the "integrated loan documents" that Innes signed on December 30, 2008 and thus the D'Oench, Duhme doctrine is either satisfied or does not apply. (Doc. 153, pp. 2-6). This is incorrect for at least two reasons. First, Land did not sign the December 30, 2008 Credit Agreement. (Pl. Ex. 18). To be sure, Innes did so both individually and in his capacity as President of Building and several

20

other entities, but Land is not a party to that agreement.  Therefore, Land did not sign.

Regardless of what may or may not have been integrated, as Land did not sign the December 30, 2008 Credit Agreement, it cannot satisfy the signature requirement of D'Oench, Duhme and 12 U.S.C. § 1823(e).  Second, it does not appear on the face of the Credit Agreement that any reference is made to the December 22, 2006 letter.  To be sure, the Agreement recites, in one place, that the 165 acres in Autauga County served as collateral but this is contradicted by the December 30, 2008 renewal of the February 27, 2006 $3.1 million Promissory Note.  The December 30, 2008 Promissory Note clearly states that it is renewing the February 27, 2006 mortgage, which recites Prattville Square as collateral.  (Def. Ex. 1).  The terms of the December 22, 2006 letter or its existence are never explicitly mentioned or referenced.  Therefore, even if Land has signed the Credit Agreement–which it did not–it still could not avoid the signature problem because the December 22, 2006 letter from Renfroe did not, indeed could not, merge into the Credit Agreement because there is no reference to it nor were the two executed contemporaneously.  Cf. Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 226, 20 So.2d 105, 107 (Ala. 1944) ("Two writings, connected by references therein to each other or executed simultaneously with respect to same subject matter and proved to be parts of entire transaction, constitute single contract at law as well as in equity."); Sewall v. Henry, 9 Ala. 24, 1846 WL 174, *5 (Ala. 1846) ("Two writings, connected by a reference of one to the other, may be considered and construed as parts of an entire transaction, and as if they were embodied in one instrument.").

**d. Land and ServisFirst consented to trial of
BB&T's D'Oench, Duhme defense.**

In their most recent brief, Land and ServisFirst argue, for the first time, that BB&T has

waived its defense under D'Oench, Duhme, and 12 U.S.C. § 1823(e). (Doc. 153, p. 9). They are

correct that this is an affirmative defense and that it was not raised in BB&T's answer. However,

too much water has passed over the dam to strike the defense.

On March 7, 2011, BB&T filed a motion to dismiss, expressly arguing D'Oench, Duhme.

(Doc. 71, pp. 11-18). On June 7, 2011, BB&T filed another memorandum, again raising

D'Oench, Duhme. (Doc. 107). On July 8, 2011, Land filed a responsive memorandum,

explicitly addressing D'Oench, Duhme. (Doc. 111). On October 28, 2011, BB&T filed a motion

for summary judgment, again raising D'Oench, Duhme. (Doc. 119, 127). Both Land and

ServisFirst filed responsive memoranda opposing the defense on the merits. None of their

memoranda raised the argument that the defense had not been raised in the pleadings or that it

was waived. (Docs. 122, 123, 125). Indeed, the issue was raised, briefed and argued, at great

length and in detail prior to trial–on the merits. After the close of evidence at trial, the Court

discussed the case with counsel and requested briefs. During that colloquy the undersigned

stated the following: "And getting back to Mr. Joseph's point early on, I did deny BB&T's

motion for summary judgment. You know, that is an interlocutory ruling. Everything is still on

the table. So you can make all of the arguments you want on statutes of fraud, on the D'Oench

doctrine." Trial Tr. 229, Jan. 26, 2012. The Court was under the impression at trial that

D'Oench, Duhme was then in issue and neither Land nor ServisFirst did anything to correct that

impression then. Considering the history of this case, the undersigned finds that Land and

ServisFirst consented to trial on the issue of BB&T's D'Oench, Duhme defense and its defense pursuant to 12 U.S.C. § 1823(e). See Diaz v. Jaguar Restaurant Group, LLC, 627 F.3d 1212, 1214 (11th Cir. 2010) (Stating that issues may be tried on express or implied consent of the parties, citing Rule 15(b), Fed. R. Civ. P.).

### 2.  The December 22, 2006 Letter did not release the mortgage on the Prattville Square Shopping Center.

Land argues that Bill Renfroe's December 22, 2006 letter, in and of itself, effected a release of the mortgage on the Prattville Square Shopping Center.  (Doc. 142, pp. 5-6).  As the letter is only three sentences long it is set forth here again:

> Dear Innes:
>
> This is to advise that Colonial Bank (Colonial) has agreed to release the Prattville Square Shopping Center as collateral on the referenced loan and replace it with 140 acres of land in Prattville. This is subject to a new appraisal being ordered to confirm that the proper loan to value on the property will be maintained.  By signing this letter you agree to pay for the appraisal on the 140 acres.
>
> Sincerely,
>
> /s/ Bill R. Renfroe
> Vice President
>
>
> BY:_____
>     Innes McIntyre        Date

(Pl. Ex. 4).

Under Alabama law, when one interprets a contract, one must follow the plain language of the contract.  Pub. Bldg. Auth. of Huntsville v. St. Paul Fire and Marine Ins. Co., 80 So.3d 171, 180 (Ala. 2010).  The tenor of the letter is clear enough.  Colonial would release Prattville Square, at some future date, and take in its place a mortgage on raw land outside of Prattville.  This was conditioned on Innes paying for the appraisal and a proper loan to value ratio being maintained.  The appraisal was not completed until January 29, 2007 (Pl. Ex. 29), more than a month after the letter was written.  Moreover, a mortgage on the raw acreage was never given and the deal was not done.  The language contemplates an agreement to release in the future and not an intention to release presently.  Therefore, Land's argument, that the letter is a release, is without merit.

### 3.  Land's arguments to the effect that it has been defrauded or that the conduct of BB&T has been inequitable are without merit.

Land claims that it has been defrauded by BB&T.  The elements of an actionable fraud in Alabama are as follows:

(a) a false representation concerning an existing fact . . . ;

(b) a representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge . . . ;

(c) reliance by the plaintiff on the representation and that he was deceived by it . . . ;

(d) reliance which was justified under the circumstances . . . ;

(e) damage to the plaintiff proximately resulting from his reliance . . . .

First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1074 (11th Cir.

1990) (citing <u>Ellis v. Zuck</u>, 409 F.Supp. 1151, 1157 (N.D. Ala. 1976)) (internal citations omitted); <u>see also</u> <u>Glenn Const. Co. v. Bell Aerospace Servs. Inc.</u>, 785 F.Supp. 2d 1258, 1276 (M.D. Ala. 2011); <u>S. Life and Health Ins. Co. v. Smith</u>, 518 So.2d 77, 79 (Ala. 1987).  Land's fraud claim fails for two reasons.  First, Land failed to prove that Colonial knew its statements were false or made them with reckless disregard for the truth.  Second, Land's claim also fails because Land's reliance was not justified under the circumstances, Innes was in aposition to know the true state of affairs regarding the swap agreement.  Thus, even absent BB&T's <u>D'Oench, Duhme</u> defense, the fraud claim fails on the merits.

While the undersigned has found that Land's fraud claim fails because there was no intentional misrepresentation and because it did not reasonably rely on it, even if these elements were met (which they are not), Land's fraud claim would be barred by <u>D'Oench, Duhme</u> and 12 U.S.C. § 1823(e).  Land contends that Colonial defrauded it by failing to follow through with the release of the mortgage on Prattville Square.  (Doc. 100).  The Supreme Court extended the reach of <u>D'Oench, Duhme</u> and Section 1823(e) in <u>Langley</u> to bar claims for fraudulent inducement and misrepresentation against the FDIC, reasoning that it would be a violation of § 1823(e).  <u>Langley v. Fed. Deposit Ins. Corp.</u>, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).  In <u>Langley</u>, the borrower claimed that it was fraudulently induced by the President of the Bank to purchase certain land and execute a promissory note.  When the Bank brought suit on the note, the borrower defended, claiming fraud in the inducement.  Similarly, Land claims fraud here, contending that Colonial defrauded it by misrepresenting the fact of the release of the mortgage on Prattville Square.  While the undersigned has found that misrepresentation was unintentional and Land's reliance not reasonable, even if the fraud claim were otherwise viable, it would

25

nevertheless be barred as the Supreme Court decision in <u>Langley</u> is squarely on point and squarely against Land's position here.

### 4. Even if enforcement of the collateral swap agreement was not barred by the D'Oench, Duhme doctrine, it would nevertheless fail for the want of consideration.

Land's original complaint was a single count complaint, sounding in contract, to enforce the collateral swap agreement. (Doc. 1). Land soon realized that a suit on a contract was a bad idea where, as here, they did not make good on their side of the bargain, but still wanted BB&T to deliver its part. A contract is often said to be a *quid pro quo,* which is Latin for "this for that." Simply put, Land wanted its *quid* but is in no position to deliver the *pro quo*. The futility of this Adversary Proceeding may be illustrated by the following hypothetical.

Imagine that Paul is a wealthy businessman with extensive investments in the stock market. In September of 1929 Paul drives to his local Ford dealer and orders a top of the line custom Model A Deluxe Roadster, with all the bells and whistles, for $1,400, then a strong price for an automobile. The car is intended for his wife, Nancy. Unfortunately, the stock market crashed in October of 1929 and, as a result, Paul was wiped out and had to file bankruptcy. A few days after Paul's bankruptcy filing, the Ford dealer takes delivery of Nancy's Model A. Notwithstanding the fact that Paul is financially embarrassed and cannot pay the $1,400 contract price, Nancy nevertheless wants her Model A Deluxe Roadster. Were Nancy foolhardy enough to sue, she would quickly find her complaint dismissed because no court would enforce a contract where the plaintiff had not paid the consideration. <u>Turner v. Newsom</u>, 3 So.3d 913 (Ala. Civ. App. 2008) (contract not supported by consideration is not enforceable); <u>BSI Rentals, Inc., v. Wendt</u>, 893 So.2d 1184 (Ala. Civ. App. 2004) (to the same effect). Land argues that it should

26

nevertheless get its *quid* (i.e. release of Prattville Square) under the contract because the contract is support bed the promise of consideration, though not its actual tender or deliver. Such an arguement should not be taken seriously. (Doc. 148). To be sure, the bilateral contract may be formed with the exchange of promises, however, one may not enforce the contract if he cannot deliver his agreed upon consideration. Just as Nacy cannot insist on her Model A because Paul cannot fork over the $1,400, Land cannot insist on the release of the mortgage on Prattville Square because neither it nor Building can provide a mortgage on the 165 acres in Autauga County.

### III. CONCLUSION

The undersigned recommends that the District Court enter judgment as follows: (1) Land's complaint should be dismissed with prejudice; and (2) judgment should be entered in favor of BB&T on its counterclaim, declaring that BB&T has a valid and subsisting mortgage on the Prattville Square Shopping Center by virtue of its mortgage dated February 27, 2006, and that the mortgage has not been released.

Done this May 30, 2012.


/s/ William R. Sawyer
United States Bankruptcy Judge


c: Scott M. Speagle, Esq., Attorney for McIntyre Land
   Leonard N. Math, Esq., Attorney for Chapter 7 Trustee
   Clifton C. Mosteller, Attorney for Branch Banking
   Thomas J. Skinner IV, Attorney for ServisFirst Bank